Good morning, ladies and gentlemen. The first case for argument is Grede v. Bank of New York. Ms. Steeve. May it please the Court, the District Court's decision in this case should be reversed because the District Court did not follow this Court's instructions on remand. First, with respect to the trustee's fraudulent transfer claim, this Court remanded for consideration of the Bank of New York's good faith for value affirmative defense under Section 548C. Citing the two leading circuit level decisions on this defense, the M&L business machines case and the Sherman case, this Court held that the legal standard the District Court was to apply on remand was whether the bank had sufficient knowledge to place it on inquiry notice. Am I right in understanding you to argue that as long as any customer assets were used improperly to secure the loan, the entire transfer or lien in this case was invalid? That's correct, Your Honor, because that voided the bank's good faith defense. Here what happened is the bank was on notice through the 1FRs that it could have reviewed, and in fact the testimony was that it did review those monthly, that the accounts were undersegregated and the District Court found that the bank knew that Sentinel was using the loan for its own proprietary purposes. Section 6DA2 of the Commodity Exchange Act and Regulation 1.20 provides that you cannot use customer segregated property to secure the loan or the credit of any other person. So by taking money out of the segregated accounts when they were undersegregated, that necessarily violated the Commodity Exchange Act because the bank knew that that loan was for Sentinel's own purpose. And the reasons, I was wondering with respect to whether Sentinel had authority to use customer's assets as security for the loan. Why couldn't the bank rely on Mr. Bloom's representation even if it was made a year earlier as you have pointed out? Well, assuming that that authorization was really front of mind in June of 2007, there were reasons found in the District Court's decision to call that authorization into question. First, as the District Court finds in its first decision, which it incorporates into the second, during that conversation, Mr. Bloom stated that Sentinel acted only as agent for its customers, not as principal. So in other words, it was telling the bankers something they knew to be untrue, that it was not engaged in proprietary trading. Secondarily, he also states during that conversation, and this is clear from Sentinel's papers with its customers, that it promised its customers same-day liquidity, that they could get their assets out on the same day. And the bank knew, and certainly knew by June, that Sentinel was not repaying the loan on a daily basis. So it couldn't be providing same-day liquidity. Those things that it knew, the District Court found objectively, should have caused the bank to question what it was being told in August. When you couple that with the fact that the bank knew that Sentinel had relatively no capital of its own, $3 million, that the court found the bank knew that they were engaged in proprietary trading, that the court found that the bank knew objectively that Sentinel was violating segregation requirements, it leads to the conclusion that under an objective basis, the bank lacked good faith. And what the District Court did here when it was assessing this good faith defense, is it says it was using an objective standard. But then it proceeds in the very next paragraph to say that the reason why there was a proof of good faith by the bank was that the banks subjectively believed what Eric Bloom had told them a year earlier. That subjective belief is exactly what the Sherman Court, the M&L Business Machines, this court said, and it's footnote number two, is what is irrelevant. The court also indicates that it's making its determination based upon credibility findings. Well, credibility findings about what the bankers deny they knew is exactly what is not relevant in an objective inquiry notice standard. Well, it seems to me that Mr. Rogers' email is a key piece of evidence. And is it possible, do you think, to read that email as expressing a concern solely about the bank's security rather than suggesting any wrongdoing by Sentinel? I mean, it would seem that that's what Mr. Law's reply to his email was focusing on. And if the bank was not actually thinking about the possibility that Sentinel might be misusing its customers' assets, what is it about the email which suggests that the bank is on inquiry notice? Well, the email states that with, and it has the number wrong, it says $20 million instead of $2 million or $3 million. With only that amount of collateral, given the size of the loan balance and given the bank's knowledge that it was used for proprietary trading, Mr. Rogers is saying, well, where can they get the collateral for this? It has to be coming from the customer segregated accounts. The testimony at trial, and this is where, you know, the district court judge says, well, all the bankers lied, but that's okay. These lies were about material things, about whether they knew about segregation and things that they obviously knew given the division of the bank that they were in. Mr. Law testifies that they spend quite a bit of time and make a considered response, that's the testimony at trial, to that email to focus solely on a fact that Mr. Rogers already knew. Which was that if securities went into the clearing account, there was a lien. So it was really a non-response. There's nothing in that email that says, have we properly perfected a lien in the clearing accounts? Does our security agreement grant us a security interest in those accounts? The common English reading of that is, is that the bank is on suspicion that there's a problem. And that's, in fact, what the district court said, that there were suspicions. Now, who was hurt exactly by this? Sentinel's customers. They're out over half a billion dollars. What effectively happened... Now, if we agreed with you about equitable subordination, would that increase the bank's liability? Or is it just an alternative ground? What we think is to avoid the liens, either by equitably subordinating those liens or by avoiding those liens as fraudulent transfers. That part of it is the same remedy. We also ask that the bank's unsecured claim that would remain if you avoided their liens or equitably subordinated them, that that be put behind the claims of other creditors. And we would submit that that is an equitable result, given that that's what should have happened in the first place. The bank is walking away, if this decision stands, with $300-plus million of property that should have been held in the segregated accounts. What's your position as to the degree of wrongdoing on the bank's part necessary to invoke equitable subordination? Is recklessness enough? I think it's unfair advantage-taking, and where this Court's instructions about deliberate indifference or reckless goes to the state of the knowledge. This Court, in the criminal context, in the civil context, imputes knowledge to a party if they are deliberately indifferent or reckless in finding out the truth. And we would submit that if you believe the bankers, and we think that, in fact, they knew, they were deliberately indifferent, at a minimum, to what was going on here. And that imputes upon them knowledge under this Court's case law on a lot of different varieties. They effectively stuck their head in the sand because it wasn't in their best interest to know the facts. And they did this during the summer of 2007, where what they were trying to do was manage themselves into a better position. The repurchased securities were physical securities that were highly illiquid. They were basically junk securities. And that's what the bank would have had a lean on. Many of those securities Mr. Greed has not been able to sell to this day. So instead what they did is they said, we don't like these securities. We require you to give us high-grade corporate securities, government securities. They knew. They had daily position reports with regard to what collateral assets were under all of the Sentinel accounts. They knew the only place those types of securities could come from was from the customer security accounts. So they effectively, if you believe them, turned a blind eye and ignored that perhaps Sentinel didn't have the right to do that, while goading Sentinel on to doing it, and then walked away with what was the highest-grade collateral and found themselves in a fully secured position. And if you look at all of the very numbered paragraphs that the District Court finds as his findings of fact, and you go back to what those telephone calls are, you can see, for example, on August 9th, Sentinel tries to put some of the collateral back in a collateral account into a segregated account. And the bank officer, if you go to that tape-recorded conversation, says, no, you can't do that. On July 31st, when Sentinel moves some of the government securities, tries to get them back into a segregated account, Mr. Law, one of the senior bankers, is on the phone with Sentinel. Within seven minutes, and shortly thereafter, Sentinel takes government securities out of a different segregated account and moves it back to the collateral account. Clearly what the bank is doing here is managing its position to get ahead of everyone else. And the Court erred because it did not apply an objective good-faith standard with regard to the fraudulent transfer claim, and it didn't apply the case law that this Court has found dealing with deliberate indifference and recklessness with regard to its knowledge in the equitable subordination point. Would you agree that the case for reversal is more difficult on the equitable subordination claim in that it arguably depends on a more culpable mental state of the bank? Your Honor, yes, in the abstract I would agree with that. However, based upon the facts of this case, I think that the facts as found by the District Court support that culpable mental state. Essentially, the bank received what it knew was stolen property. Sentinel had no authority to desegregate those accounts. And the Court failed to apply this Court's instructions on remand, both with the good faith and with the equitable subordination. It didn't apply the correct legal labels to that conduct. What do you make of the Rogers letter? I can't find my copy of it, but right there is a... The email, Your Honor, the June 13th email? What we make of it is that it shows that the bank knew and suspected and therefore objectively was on inquiry notice, was deliberately indifferent, because it basically states, how can Sentinel have $300 million of collateral when it's only got $3 million of its own assets? The Bank of New York is the largest custodian in the world. It knows what a custodian does. It's the largest what? Custodial bank in the world. It specializes in holding segregated accounts like this for financial firms like Sentinel. It knows that Sentinel is moving money out of segregated accounts. The reasons that the district court judge gives for why they should have thought that was okay was this conversation from a year earlier where they knew Mr. Bloom was saying things that were not truthful and would call into question the customer's authority. If you look at that conversation, Mr. Bloom says at several times, it's in our separate appendix at page 38 and 39, he says at several times we must keep true segregation for our FCM customers. So he tells the bank they have to keep segregation. There's nothing in there that suggests, because he says he's not engaged in proprietary trading, that there's any pledging of securities that's authorized for Sentinel's proprietary trading. The nature of Sentinel's business, which he tells them about in that phone call and which they otherwise know about because they've signed CFTC letters, would suggest that there couldn't be customer authorization. What Sentinel did is it had accounts for FCMs that they could treat as if they were segregated accounts. So the customer's permission that matters here are the customers of Sentinel's customers. And because FCMs are allowed to pool segregated accounts as long as they keep the segregation, you would have had to have had every customer of every one of Sentinel's customers authorizing the violation of the segregation requirements to reach the conclusion that the district court reached. And who are the customers of Sentinel's customers? They would be parties who invested their money with an FCM. What kind of, are there companies or individuals? Individuals and parties who trade in the commodities market. And then commodities firms would use Sentinel as a place where they could invest their segregated funds. And so the nature of that business would have told the bank that they couldn't possibly have had the consent that they were supposedly inferring from this conversation a year earlier. And there's no evidence the bank ever investigated. They had the ability to ask Sentinel for any documents. They had the ability to go into their premises and look at whatever they wanted as evidence by what they did on August 14th and 15th when they stormed the doors because they were upset that Sentinel had closed. They could have called customers. They had the authority to do that. They had every ability to find out the answers to these questions and they chose not to do so. I think that I'm running into my rebuttal time unless the court has other questions. Thank you, Ms. Steeve. Thank you. Ms. Oterizzi? Good morning. May it please the court. Michelle Oterizzi, Fourth Defendants. In answer to your Honor's question, the customers here are divided into two basic groups. One are the FCM customer assets where the FCMs were giving Sentinel assets that belonged to their own customers, and those are subject to the CEA segregation requirements. And then there are other customers, FCM house accounts, hedge funds, high net worth individuals, sophisticated people who are giving Sentinel their money. That's in the SEG-3. Those are under the Investment Advisors Act, so those aren't even under the Commodities Exchange Act. Let me just ask you this at the outset. Particularly as to the fraudulent transfer claim, I get the sense that on remand, Judge Zagel just did not want to impose liability on the bank, even if that was the logical import of the factual findings he had already made, given the legal clarifications we made in the prior appeal. Is my impression off base? I mean, it just seems fairly clear from our prior opinion that we thought the trustee would in all likelihood prevail on the fraudulent transfer claim. Well, Your Honor, on the fraudulent transfer claim, this Court... Could you speak up, please? I'm sorry, Your Honor. The Court here did not look at the good faith issue. You said some very strange things. Very strange. There were instances during trial in which bank employees gave testimony I did not believe. Yet in this case, lies on the witness stand coming from the mouths of some bank New York Mellon witnesses do not lead me to infer that the truth would help trustee. What does that mean? I think what the judge was saying is that some of the bank officers may have exaggerated how careful they were with the law. No, he says they may have lied. Well, they may have lied about how careful they were and tried to make themselves look better. What the judge said is that they weren't lying when they said they did not believe that Sentinel was doing anything wrong. Well, he doesn't say that. Well, he said that in his clarification of his opinion because this court... I'm talking about his second opinion, the remand opinion. I mean, that's what I read from. Well, that... I think what you were reading from, Your Honor, was from his first opinion. The witnesses appear to have difficulty accounting for their own motivation? What does that mean? Rogers was unable to recall why he wrote... The memo. ...the June 13, 2007 email and why he would have been satisfied with the response when it did not directly answer his question? What's that about? Well, what he's saying, Your Honor, is many years later... Sounds really bad. Many years later, he can't remember. But you have to remember that Mr. Rogers is a senior credit person. He's not in charge of the day-to-day relationship with Sentinel. Why did he testify? Well, because he wrote this memorandum and he wrote it, or he wrote the email, because his job is to ask, do we have enough collateral for our loans, to support our loans? And that's what he was asking, do we have enough collateral? That's his job as the credit guy. He asked the Sentinel relationship people who know a lot more about the situation, and they responded to him and said, yes, we do. We have rights over everything in our lienable accounts. Let's go back again to Mr. Rogers' email, just for a moment, even if his concern was about the bank's security. When he's raising the possibility that Sentinel was mostly using customer assets to secure the loan, isn't that alone enough evidence that there was a need to inquire into Sentinel's solvency, even if it wasn't, even if it were not enough to look into the possibility of outright wrongdoing? No, Your Honor, because the problem in this case is everyone knew that Sentinel was using customer securities to secure loans. That's obvious from their financial statements. The SEC knew it, the CFTC knew it, everyone knew it. So the fact that they were using customer securities to secure the bank loan is not... Look, the judge also said on remand that the bank was reckless. I think that on remand, Your Honor, I believe that the judge said that the bank was not reckless, it was not even negligent. He said, seems to be ineffective and reckless in light of the facts. Well, Your Honor, what he was saying there, and that comes from his first opinion, where he said... The facts demonstrate that by the middle of June, at least one bank employee was suspicious, and others should have known that Sentinel was violating segregation requirements. So they should have known. So what? Why didn't they? And he says, difficult to see how reliance on Sentinel's representations, warranties, etc., is objectively appropriate. And then he goes on, he mentions recklessness. And he goes on and mentions, you know, lies. Your Honor, respectfully, that is from his first opinion. No, this is the second opinion. Isn't it the second opinion? Respectfully, it's from... May 2015. Isn't that the second opinion? I believe it's from... In his opinion on remand, he says he does not believe the bank was even negligent. In any event, why was the bank not at least on inquiry notice of Sentinel's possible insolvency once we arrive to the summer of 2007? There's a general liquidity crisis. Sentinel's overnight loan balance is ballooning. The bank is reviewing the loan daily. Mr. Rogers seems to be wondering how Sentinel is managing to find 300 million in capital to secure the loan, and, well, so forth. Anyway, particularly, given Judge Sagel's original observations that the bank could and should have looked at this more closely, it seems to me that he had all but found the bank was on inquiry notice prior to the remand. I think what, Your Honor... Regardless of whether, you know, that's the first or the second... In the original opinion, the judge was talking about constructive notice. He said if they had read the 1FRs, if they had done that, they would have seen it. On remand, he said, but they didn't look at the 1FRs. They didn't know that there were these issues, and, therefore, they weren't on inquiry notice and that they weren't negligent. Now, in terms of where they were financially, what he found on remand was that, yes, they had hit a rough patch, but that the bank believed that they were looking for alternatives to replace the repo financing that had fallen through and that they did not believe that Sentinel, at that point, was insolvent. And, again, we have to look back at the point at which these transfers were made. Well, what was the response to Rogers' letter or email? The response by Mr. Law, who was the Sentinel relationship manager, was, yes, we have rights over everything in the lienable accounts. This is a reply from Sentinel. No, it's a reply from the bank. He's not asking Sentinel these questions. Well, Rogers is part of the bank. He's asking internally. He's asking the internal Sentinel relationship people, do we really have rights over all of this collateral? And the answer that he gets is, yes, we do. And what was the basis of the answer? Because the bank had rights over everything that was in the lienable accounts. And remember... Well, does the trustee have a point when he says that if the bank was relying on Mr. Bloom's assurance that Sentinel had authority to put customer funds into the lienable account, that reliance was much less reasonable in the summer of 2007 than it was in 2006 because, look, times had changed significantly and Sentinel was obviously under an extraordinary amount of financial pressure, wasn't it? Well, Your Honor, yes. I mean, the financial crisis was at the beginning at that point in time and its repo counterparties had returned some of these securities. But that doesn't mean... I mean, the bank didn't have a crystal ball, so they didn't know what was going to happen in August when the credit markets froze, which is what happened to Sentinel. But, Your Honor, it's not just Eric Bloom's say-so. What you have here is the fact that everyone knew that customer securities were being used. No one questioned it. The sophisticated customers didn't question it. The auditors didn't question it. The regulators who did yearly examinations of Sentinel to make sure that they were properly segregated, they didn't question it. Everybody knew that Sentinel was doing proprietary trading. Everybody knew that they were following a leveraged investment strategy on behalf of their customers and therefore could use customer securities for that strategy. That's what the bank reasonably believed. And the fact that nobody ever said you can't... How could the bank reasonably believe that without any documentation? What the district judge found in several different ways was that a representative of Sentinel had orally assured the bank that these securities had been transferred with customers' permissions. The judge didn't find that the bank had ever seen documents suggesting that that was true. Don't you find it highly unusual for a bank to make what amounted to, at one point, a $600 million loan on the basis of oral representations that, well, could easily be false? And, of course, were false. Well, Your Honor, it's not just the oral representations. In the customer... The oral representations were what the district judge relied on. And that seems to me very hard to square with footnote 2 in our original opinion and the general concept of inquiry notice. The judge found the bank wasn't even on inquiry notice because somebody at Sentinel said everything was okay. And also, Your Honor, because the account agreement, the way it's set up, every time Sentinel moves money, it's representing to the bank that it has the authority to do that. And if you... But everybody who's engaged in some kind of fraud will represent that it had authority to do it. But, Your Honor... The reason to look at documents is to check whether that's true. But the agreement specifically says, we have the right to do this, and it also says that the bank owes no duties whatsoever to Sentinel's customers. And even under the law at the time, if you're looking at the CFTC regulations, the only time a bank has any duty to inquire is when it actually knows there's been a segregation violation, which it does not. When it knows what? When it actually knows there's a segregation violation. Wait, I'm sorry, I'm not following you. The only time the bank has... Has a duty to inquire further... Yes, is... Once it knows what? I can't hear you. That there is a segregation violation, a violation of segregation requirements. Then that triggers a duty. Forgive me, are you talking about Section 550? No, Your Honor, I'm talking about the Commodities Act. Because they say that you had a duty as a matter of law, and that maybe the CFTC was depending on the bank to find this. But the fact is, it was a regulated entity, and the regulators didn't find it. So if you're saying that the bank was the one who should have been inquiring and the bank should have known, it's the only one in all of this who should have asked. Perhaps the regulators would have found this if they had had a $350 million incentive to find it. One common problem with government service is you can't pay the government employees for finding Bernie Madoff's fraud or even Sentinel's far lesser fraud. Well, Your Honor, the judge also found on remand that even a diligent inquiry by the bank would not have uncovered the fraud. The judge also found on remand that the bank had in its possession documents that if read carefully would have revealed the fraud. The 1FRs, which again... And then he found the bank didn't bother to read them carefully. But one banker did notice that there was no loan from the bank on that document. He sent it to Sentinel and Sentinel sent it back and said, here's our year-end 1FR and our audited financials. They tie together. These bankers, Your Honor, are not experts in segregation. They don't know what's going on with Sentinel's business. The transactions are going around at light speed and they just can't check every one of them. Let's talk about the remand opinion. Judge Zagel says, I further found that a reasonably prudent person would have taken a closer look at these IRs reports. Reports that revealed with relatively cursory review that Sentinel was violating segregation requirements. Then he says, nevertheless, the bank neither knew nor turned a blind eye. I don't get that. How do those two sentences go together? Because he found that the bankers actually did not read those in the depth that you would need to to find it out. But he says a reasonably prudent person would have looked. And if you're not reasonably prudent, you're on notice. Your Honor, I think what he says in his second opinion... That's what he said. But he said they weren't being prudent bankers. He was not saying that they had a duty to look to protect Sentinel's customers. We know what he concluded. Your Honor, you asked a question early on about recovery. It may be entirely from the banker's perspective. They engage in so many transactions, and so few of them are fraudulent, that reading these documents doesn't repay the time needed. But it does seem to me that if the bank takes that position, then it has to swallow the loss in the cases where it easily could have prevented the loss by reading the documents. Well, Your Honor, again, Judge Sacco found on remand that even a diligent inquiry wouldn't have figured this out. But then what does it mean to say that even a relatively cursory reading of these documents would have revealed that these assets had to be segregated? Well, Your Honor, I think that if you look at... Again, there are discrepancies between the audited financials, which do reveal that you are using customer securities, and the 1FR. If I could just answer your question, Judge Posner, at the beginning about the recovery here. On equitable subordination, the first time around, the judge, just as kind of a fail-safe, talked about what the damages would be on equitable subordination, and he said they were about $40 million. And on the fraudulent transfers, an issue we haven't gotten to, but is in the briefs, is that the trustee had to show which fraudulent transfers they're talking about, because specific securities were transferred in those fraudulent transfers. The trustee has to show that they were still there on the petition date. Why is the trustee obliged to tie specific transfer to specific collateral? Because, Your Honor... If any customer collateral is used improperly, isn't the transfer wrongful period? Your Honor, the theory of the case, and at summary judgment, we had a dispute about whether the trustee had to do specific transfers or whether he could just take the position that they're all bad. And the trustee, we said he had to do the specific transfers, and the trustee said, you know what, you're right. I'm only going to do these five specific transfers of specific securities. And that was the way the case was tried. It was the way it was appealed. That was all they proved, that those five were bad. And so if they want to avoid the liens on those transferred securities, they have to trace them, and they never did that. Okay, thank you, Ms. Polizzi. Thank you. So, Ms. Steeves, anything further? Your Honor, just briefly with respect to the Section 550 point, Section 550 doesn't apply here because we were avoiding liens on property that was in the trustee's possession. As this court found in its first decision, the trustee had proved a prima facie case to avoid the bank's lien on the collateral account. There's no tracing requirement in Section 551 or in Section 550, and we would submit that those arguments were in error. With regard to the colloquy about what was or was not in the second supplemental opinion, we believe, Your Honor, Judge Posner, you are correct. The whole of the second opinion includes the first opinion. The district court, in his opening section of his second supplemental opinion, incorporates everything that he said in the first decision and then incorporates everything this court said in its decision. So those are the findings of the court. There was not one jot of additional evidence. The bank didn't seek to come in and present any additional evidence. That was the record on which this case was decided, and we would agree with Judge Rovner's observation that what the district court was trying to do was weave away around findings he had made at a time when he was much closer to the evidence than he was four years later when he wrote this clarifying opinion without any additional evidence. And so we would ask that the court reverse and enter judgment for the trustee on this case. Before you go, I have a collateral inquiry, but a different kind of collateral. Eric Bloom, the CEO, and Charles Mosley, the head trader, are both in prison, I understand. Anybody else being criminally prosecuted for their roles at Sentinel? Not that I'm aware of. I believe they gave immunity to other parties. I think that that is correct, yes. Okay, thank you. Okay, thanks very much to both counsel.